**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Omer Thomas CARON, Defendant-Appellant.**

**No. 72–2049.**

United States Court of Appeals, Fifth Circuit.

Feb. 28, 1973.

Rehearing Denied March 29, 1973.

Henry Gonzalez, Tampa, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Bernard H. Dempsey, Jr., Claude H. Tison, Jr., Asst. U. S. Attys., Tampa, Fla., for plaintiff-appellee.

Before TUTTLE, WISDOM and SIMPSON, Circuit Judges.

TUTTLE, Circuit Judge:

The sole issue in this case is whether evidence procured by means of a wiretap may be introduced by the government for impeachment purposes without a prior determination by the trial court that the wiretap was lawful. We affirm on the basis of Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

The facts are as follows. On June 10, 1971, a two count indictment was returned against appellant Caron, charging that he had on two occasions given false testimony in an appearance before a federal grand jury on April 7, 1971. Count One of the indictment alleged that Caron had committed perjury by denying that he had ever done any bookmaking, Count Two, that Caron had perjured himself by denying that he knew a Howard Gardner.

Trial of the case commenced on March 27, 1972. Following the prosecution's case in chief Caron took the stand as the sole witness in his defense. Although he admitted that at the time of his appearance before the grand jury he was well-acquainted with Howard Gardner, he stated that if he had denied knowing him, it had been a mistake. As to the allegation in Count One of the indictment, Caron, on direct examination, testified as follows:

"Q: Mr. Caron, you are a gambling man, aren't you?

A: Yes.

Q: What is it that makes you want to gamble? Why do you gamble?

A: It is a form of relaxation.

Q: Is it your business?

A: No, sir.

Q: Have you ever been engaged in the business where you take bets from anybody that comes along?

A: No.

Q: Did you ever take any bet that you can remember that you ever laid off, in the meaning of the expression 'Lay off'?

A: No.

Q: You didn't. Did you deal with anybody else?

A: Yeah.

Q: — In laying off bets or dividing up a bet?

A: No, sir.

Q: Were these man-to-man or head-to-head bets?

A: Yeah, they were.

Q: Was there any charge, 'vigorish,' percentage with any of those men?

A: No. No charge.

\* \* \* \* \* \*

Q: Mr. Caron, are you a bookmaker?

A: No, I am not."

On cross-examination Caron further denied that he was engaged in bookmaking, though he admitted that he knew one alleged bookmaker, a Louis Figueredo, and that he had placed two or three wagers with Figueredo during the 1971 football season. Thereafter, the prosecutor, on the basis of tape recordings which the government had procured by means of a wiretap on Figueredo's telephone in November and December, 1971, asked Caron a series of questions as to whether Caron, on specified dates, had had telephone conversations with Figueredo in which they discussed the current lines on games, laying off wagers, and the like. Caron was unable to recall many of the alleged conversations, but he denied having engaged in at least three of them as to which he had been questioned.

In rebuttal and for impeachment purposes the government then sought to introduce into evidence the tape recordings of the intercepted telephone conversations. The district court, over Caron's objection, ruled that the government would be permitted, without a prior evidentiary hearing on the validity of the wiretaps, to introduce in rebuttal the recordings of any conversation about which Caron had been asked and which he had denied having engaged in. Recordings of conversations which he had professed not to remember would not be admitted. Under this limitation the government played to the jury the tapes of two conversations, one on November 13, 1971, the other on December 8, 1971. The two voices were identified as those of Caron and Figueredo and an expert witness testified that the substance of their conversations consisted of the argot of professional bookmakers.

The jury found Caron guilty on both counts of the indictment and he now appeals, contending that the procedure followed in admitting the tapes into evidence was constitutionally infirm.

■■ We note at the outset that by categorically denying on *direct* examination that he was a bookmaker, Caron effectively opened the door to the questions which the prosecutor put to him concerning his connections with Figueredo.[1] Thus, it is evident that if the tape recordings were the product of a *valid* wiretap, their use for impeachment purposes would have been proper. The question here, of course, is whether such use is nonetheless proper in the absence of any determination by the trial court that the wiretap in question was lawful. In the light of Walder v. United States, supra, we must answer that question in the affirmative, for, under the holding in that case, even if it had been found that the wiretap was unlawful, use of the tape recordings solely for impeachment purposes would not have been proscribed.

In the Walder case the petitioner had been indicted in 1950 on a narcotics charge, but the indictment was dismissed when his motion to suppress the

---

1. Compare Walder v. United States, supra, with Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1929). We would point out that the questions concerning Figueredo and the telephone conversations of November and December, 1971 were plainly as to matters collateral to the issues raised by the indictment and for which Caron was on trial, to wit, whether Caron had given false testimony to the grand jury in April, 1971.

physical evidence, on the grounds that it had been procured through an illegal search and seizure, was granted. Subsequently in 1952 Walder was again indicted for violations of the narcotics laws. He testified on direct examination that he had never possessed any narcotics and the government sought to impeach this broad assertion by introducing the testimony of one of the officers who had participated in the prior illegal search and seizure and also of the chemist who had analyzed the narcotics seized at that time. The trial court admitted the evidence solely for impeachment purposes and thus, the question which eventually reached the Supreme Court was whether the defendant's assertion "on direct examination that he had never possessed any narcotics opened the door, solely for the purpose of attacking the defendant's credibility, to evidence of the heroin unlawfully seized in connection with the earlier proceeding." 347 U.S. at 64, 74 S.Ct. at 355. The Court said:

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment.

Take the present situation. Of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics. Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for

its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility."

347 U.S. at 65, 74 S.Ct. at 356.

We think that the case before us falls squarely within the holding of Walder. Caron contends, notwithstanding, that the Walder rationale was effectively discredited by the decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but whatever doubts we might at one time have entertained in this respect were put to rest by the Court's more recent holding in Harris v. New York, 401 U.S. 222, 91 S. Ct. 643, 28 L.Ed.2d 1 (1971) in which Walder, if ever it had been faltering, was revitalized.

■ We consider then whether the result in this case should be affected by the fact that, unlike Walder, evidence procured pursuant to an invalid wiretap is subject to a statutory exclusion under Title III of the Omnibus Crime Control Act of 1968. 18 U.S.C. §§ 2510 et seq. Section 2515 of the Act provides:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial . . . if the disclosure of that information would be in violation of this subchapter."

We note that in the legislative history of the Act Congress made it clear that the above-quoted provision should not be construed as requiring exclusion of the evidence in circumstances such as those before us. The Senate Report on the bill states:

"Section 2515 of the new chapter imposes an evidentiary sanction to compel compliance with the other prohibitions of the chapter. It provides that intercepted wire or oral communications or evidence derived therefrom may not be received in evidence in any proceeding before any court. . . .

\* \* \* \* \* \*

The provision must, of course, be read in light of section 2518(10)(a) discussed below, which defines the class entitled to make a motion to suppress. It largely reflects existing law. It applies to suppress evidence directly or indirectly obtained in violation of this chapter. [citations omitted]. There is, however, no intention to change the attenuation rule. [citations omitted]. *Nor generally to press the scope of the suppression role* [sic] *beyond present search and seizure law. See* Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954)." S.Rep.No.1097, U.S.Code Cong. and Admin.News (90th Cong., 2d Sess., 1968), pp. 2184–2185. (Emphasis added).

We conclude, therefore, that there was no error in the procedure followed by the district court.

The judgment is affirmed.