## 1356

William A. NASH, Appellant v. Shirley R. BYRD, Respondent.
(381 S. E. (2d) 913)

Court of Appeals

*H. Michael Spivey,* Mauldin, *for appellant.*

*Robert M. Rosenfled,* Greenville, *for respondent.*

*Fletcher C. Mann, Jr.,* Greenville, *guardian ad litem.*

Heard March 20, 1989.

Decided June 12, 1989.

*Per Curiam:*

This is a dispute between divorced parents over the father's visitation rights with his son. The family court conditionally suspended the father's visitation. He appeals. We affirm and remand.

In December 1982, William A. Nash and Shirley R. Byrd were granted a divorce. The mother was given custody of the couple's minor son, Jason. The father's extensive visitation privileges included alternate weekends, every Wednesday afternoon, one week before or after Christmas, Thanksgiving Day on alternate years, Father's Day, Nash's birthday, and a portion of Jason's birthday. The father had visitation privileges for the entire summer with the exception of alter-

nate weekends and a three week period chosen by the mother.

After the divorce, Nash engaged in a course of conduct calculated to harass Byrd and gain information to support a change of custody. He made derogatory remarks towards Byrd or about her in Jason's presence. He parked his car in vicinity of the Byrd residence and lurked about. Blowing his horn and maneuvering around the Byrd's vehicle, he followed Byrd and Jason to work or school. This conduct contributed substantially towards Jason's feelings of anxiety.

During the first summer visitation, Jason developed gastrointestinal problems. In September 1983, Jason was referred to Dr. David R. Price, a clinical psychologist. Dr. Price determined Jason had anxiety resulting from: (1) a fear that his father was watching his apartment and (2) difficulties with his father and his father's family.

In May 1984, Byrd petitioned for a restraining order and modification of visitation. The court eliminated Nash's Wednesday afternoon visitation privileges and set forth specific visitation procedures. The order restrained Nash from coming around or about Byrd's residence and Jason's school. The order also recognized that Jason needed continued counseling and encouraged both parties to consider the recommendations of Dr. Price.

After the 1984 order, Nash's family became involved in the matter. The family questioned Jason about alleged acts of abuse or neglect. They reported allegations of neglect to the Department of Social Services. Nash's mother assisted Jason in sending two letters to the court which expressed dissatisfaction with his mother and alleged neglect and abuse. Nash's brother prowled about Jason's school. He followed Byrd's car and maneuvered about in a reckless manner. During the second summer visitation, Jason's stomach problems returned, although he had no similar problems when he was residing with the Byrds.

Again, Byrd brought an action for relief. In an order dated February 28, 1985, the judge noted that (1) during the visits the Nash family discussed abuse or neglect with Jason, (2) Jason felt compelled to make false reports of abuse and neglect, and (3) because Jason knew the statements were false, the visits led to feelings of anxiety and stress. Further,

the court noted that the Nash's mother and brother had done many of the very things Nash had been enjoined from doing. The court stated that if they had been made parties to the action, "they certainly would have been required to answer for any such actions which were undertaken to frustrate or defeat the intent of the Orders of this Court." The court modified the summer visitation from all summer to alternate weekends and three five day periods which had to be at least seven days apart.

After the 1985 order, Jason reluctantly continued to visit with Nash during the regularly scheduled visitation periods. On a number of occasions, Nash's mother and brother disparaged Byrd in Jason's presence and used various means to intimidate the child. Without advance warning, in November 1985, Jason refused to go on visitations with his father.

Byrd immediately contacted Dr. Price and her attorney. Attempting to avoid litigation, they contacted Nash's attorney and exchanged a number of letters. Dr. Price advised Byrd that if Jason were forced to visit with Nash, he would likely suffer a recurrence of his former physical and emotional problems. Byrd and Dr. Price offered to work with Nash in resolving these problems. However, Nash refused to do so and simply demanded his visitation rights. A ritual soon developed. Byrd would get Jason dressed for visitation. Nash would arrive for the scheduled visit. Jason would refuse to get in the car.

In June 1986, Nash brought an action to have Byrd held in contempt of court for her failure to allow Jason to visit with him. She counterclaimed requesting an increase in child support and suspension of visitation privileges until Nash agreed to participate in counseling with Jason. In September 1986, a guardian ad litem was appointed for Jason. In an attempt to rebut the expected testimony of Dr. Price, Nash requested an independent psychiatric evaluation of Jason. During February and March 1987, Dr. Lecroy made an independent evaluation of Jason.

Meanwhile, Nash's father was severely ill. Nash wanted to pick up Jason and take him to the hospital. Jason did not want to go with Nash. Nash called Jason and attempted to coerce him into doing it his way or not at all. Unfortunately for Nash, Byrd was taping the conversation. After the inter-

vention of the guardian ad litem, Jason visited with his grandfather.

On May 11, 1987, the court held an eleven hour hearing. The parties were represented by counsel and the guardian ad litem took an active role. The court admitted the tape recording of the phone call between Jason and Nash and numerous photographs of Nash's family driving in the areas around the Byrd's residence.

In an order dated July 13, 1987, the court noted that the case history showed a systematic reduction of visitation privileges due to Nash's conduct towards his son. The court found that Byrd had taken reasonable steps to facilitate visitation and refused to find her in contempt. The court revoked all visitation privileges until Nash underwent a counseling program to reestablish his relationship with his son. The order required Nash to pay $1,000.00 towards Byrd's attorney fees, $1,500.00 for the guardian ad litem fee, and $625.00 for Dr. Price's fees.

Nash appeals the judge's failure to find Byrd in contempt, the admission of the recorded telephone conversation, the suspension of visitation privileges, the award of attorney's fees, and the award of the guardian ad litem fee.

I.

Nash asserts that the trial judge erred (1) in finding that the problems with visitation were caused by Nash's conduct, (2) in finding that Byrd had taken all reasonable measures to resolve the visitation problems, and (3) in failing to find Byrd in contempt of court.

A determination of contempt is a serious matter and should be imposed sparingly. *Haselwood v. Sullivan*, 283 S. C. 29, 320 S. E. (2d) 499 (Ct. App. 1984). The question whether it is or is not imposed is within the discretion of the trial judge, which will not be disturbed on appeal unless it is without evidentiary support. *Id.*

We find no error in the judge's determination that the problems were caused by Nash's conduct and that Byrd took all reasonable steps to resolve the problems. The record is replete with evidence as to the father's fault. For example, during visitations, Nash did not protect Jason from harassment by Nash's mother and brother. Also, it was Nash who

precipitated the suspension of visitation by telling Jason that, if he did not want to, he did not have to visit anymore.

Likewise, the record shows that Byrd took reasonable steps to resolve the visitation problem. When Jason refused to visit, she told him that he had no choice and discussed the matter with Dr. Price. The correspondence from Byrd, Dr. Price, and Byrd's attorney manifests her desire to resolve the problem. She even offered to pay the initial fee, if Nash would visit with her and Dr. Price to discuss the problem.

Given these facts, the judge did not err in refusing to find Byrd in contempt of court.

## II.

Next, Nash asserts the judge erred in admitting into evidence the tape recording of his and Jason's conversation. He asserts that the conversation was taped in violation of Federal law and, as such, was inadmissible. *See* Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. sections 2510 to 2520 (1982).

Section 2515 provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial ... if the disclosure of that information would be in violation of this chapter.

Assuming that the taped conversation violated the provisions of the Act, the trial court still correctly admitted the recording. Section 2515 was not intended to prevent the use of illegally obtained recordings of telephone conversations for impeachment purposes. *Jacks v. State*, 271 Ind. 611, 394 N. E. (2d) 166 (1979) *petition for habeas corpus dismissed sub nom. Jacks v. Duckworth*, 486 F. Supp. 1366 (N. D. Ind. 1980), *cert. denied*, 454 U. S. 1147, 102 S. Ct. 1010, 71 L. Ed. (2d) 300 (1982).

In this case, Nash testified that he called several times to see if he could take Jason to see his grandfather. On cross examination, Nash denied (1) calling Jason stupid, (2) cursing his son, (3) telling his son to "go jump in the river," and (4) telling Jason that if he did not go see the grandfather, he was not sure he ever wanted to see

him again. Byrd introduced the tape specifically for impeachment purposes. The taped conversation included the questioned statements and convincingly impeached Nash. We find no error in the admission of the tape.

### III.

Next, Nash asserts the judge erred in suspending visitation until he received counseling. He asserts that he and his son have a normal relationship and counseling is not necessary.

The question of limiting visitation rights is a matter addressed to the broad discretion of the trial court. *Hartley v. Hartley*, 292 S. C. 245, 355 S. E. (2d) 869 (Ct. App. 1987). In the absence of a clear abuse of discretion, the trial court's order limiting visitation rights will not be disturbed on appeal. *Id.*

In determining visitation rights, the welfare of the child is the paramount consideration. *Grimsley v. Grimsley*, 250 S. C. 389, 158 S. E. (2d) 197 (1967). The child is the innocent victim of the broken home and at best has a most difficult time in adjusting to the separation of the parents. It is therefore the duty of the parents, irrespective of other considerations, to lend their aid in creating an atmosphere that will foster the best interests of the child. Neither parent has a right to use the child as a pawn or club in dealing with the other and, where such is done to the detriment of the child, it affords proper ground to deny or limit visitation privileges. *Id.*

In this case, Nash has refused to work to resolve the visitation problems. Nash has spurned Dr. Price's invitations to meet with him to attempt to resolve the visitation conflicts. He has simply demanded his visitation rights without regard for the feelings and sensitivities of the child. In effect, Nash has used the prior visitation order as a weapon to place Byrd in the dilemma of either subjecting Jason to potential emotional harm by forcing him into visits or subjecting herself to contempt sanctions by not insisting that Jason visit Nash.

The record amply supports the need for supervision and counseling. Dr. Lecroy, the independent psychiatrist selected by Nash, testified that visitation should not take place un-

supervised. Dr. Price testified that Jason was angry at Nash for not trying to work on the situation. He recommended resuming visitation with supervised visitation for short periods of time and expanding visitation as the relationship between the two became more harmonious. Further, the guardian ad litem recommended that Nash attend counseling and that visitation occur on a limited, supervised basis at a neutral site.

We find no error in the judge's determination that court ordered visitation is not in the best interest of the child at this time. Further, we find no abuse of discretion in the judge's suspension of Nash's visitation privileges until he undergoes counseling and reestablishes his relationship with his child.

## IV.

Finally, Nash asserts that the judge erred in requiring him to pay attorney's fees and the guardian ad litem fee. He asserts attorney's fees should not have been awarded and the guardian ad litem fee should have been paid by Byrd or split.

An award of attorney's fees rests within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion. *Reid v. Reid,* 280 S. C. 367, 312 S. E. (2d) 724 (Ct. App. 1984). An award of guardian ad litem fees lies within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion. *See Garris v. McDuffie,* 288 S. C. 637, 344 S. E. (2d) 186 (Ct. App. 1986) (the same equitable considerations which apply to attorney's fees also apply to costs).

We find that the record supports the award of attorney's fees and the guardian ad litem fee. The order makes the following findings of fact: (1) Nash earns substantially more than he did at the time of the original decree, (2) although Byrd is presently employed, she has no separate estate from which she can pay her attorney, and (3) Jason has greater needs. Nash does not appeal these findings of fact, but attacks the award because there was no financial showing that Byrd was not able to pay. The fact that the wife may have sufficient assets to pay attorney's fees is not the basis upon which their award is to be deter-

mined. *See Reid v. Reid, supra.* We find no abuse of discretion in the award of attorney's fees and the guardian ad litem fee.

The guardian ad litem submitted a brief and participated at oral argument of this appeal. At the oral argument, the guardian ad litem requested an additional fee for costs and time spent on the appeal. On appeal, an appellate court may award fees beyond the amount of costs and fees required by Rule 38 of the Supreme Court Rules. *Cf. Shaluly v. Shaluly,* 284 S. C. 71, 325 S. E. (2d) 66 (1985) (attorney's fees for appeal). We find that the guardian ad litem is entitled to a fee for his additional services. We find that Nash is the appropriate party to be charged with the fee. We remand for determination of the appropriate guardian ad litem fee.

For the reasons stated, the judgment is

Affirmed and remanded.